Good morning ladies and gentlemen. We have six cases on the calendar this morning. One from just about each of the tribunals from which we hear appeals. We have a patent case from district court, a veterans case from the court of appeals for veterans claims. We have a customs trade case from the court of international trade, a patent case from the patent office, a tax case from the court of federal claims, and an employee case from the merit systems protection board. The last two are submitted on the briefs and therefore will not be argued. First case is Ultimax Cement and Hotland v. R.C. Cement Holding Company and v. C.P. Cement, a lot of parties here, 2008-12-18 and 14-39. I notice you've elected to have Mr. Khashoggi do the whole argument, which is probably a very good idea. And I note that Mr. Kariak has a cross appeal. I just point out that it's only on sanctions. And since it's a reply on the cross appeal, then only if there's something to reply to. So with those rules, we'll proceed. Mr. Khashoggi. Thank you, Your Honor. May it please the court. I'm Saeed Khashoggi. I'm here representing the inventor, Hassan Kumbargi, and two assignees and principal plaintiffs, Ultimax Cement Manufacturing Corporation and K.A. Group. Mr. Michael Annis is here representing Heartland Cement Sales Company. Mr. William Robinson of Foley and We've read their briefs on those issues. We've read the briefs on all the issues, but we understand those issues. Your Honor, I think the heart of the appeal is the construction of the claim term soluble calcium sulfate anhydride with a D in the 556 patent. We see this as the most important issue and the one that proceeds most directly from this ruling in Phillips. You're saying it basically means anhydrous? Yes, Your Honor. Yes, anhydrous, which could be at the beginning of the term, the end of the term. It's a modifier of calcium sulfate, just like soluble is a modifier. I just wanted to take you back one step. There are a couple of statements which I found confusing by the district court in which he suggested that the 556 patent had been invalid. That's just held invalid. That's just a mistake, right? I would assume so. That wasn't the basis of the motion or the final ruling. All we're dealing with is a question of non-infringement of the 556. That is correct, which proceeds from the claim construction. Wasn't there a laches holding on 556? Yes, Your Honor. Also on summary judgment. And I would suggest that the district court applied the wrong standard on summary judgment for laches, did not perhaps correctly follow this court's decision in Wanless versus Feathers. But even if you're right on the anhydrous, if you lose on the laches, then at least at the present time for purposes of this suit, you've lost on that patent. That is correct. That's why I'm prepared to address the laches issue. Perhaps we could go directly to that. Let's keep in mind. Before you leave the anhydrite and the hydride, you're not suggesting, are you, that post Phillips, the district court errs by looking at dictionary definitions in connection with claim construction? Not at all, Your Honor. And this court's subsequent decisions, which we have cited, states that the court may look at the dictionary definition. However, whereas here there is ambiguity in the dictionary definitions or a choice among dictionary definitions. Well, not really, is there? I mean, you know, you could say there maybe there's ambiguity because the dictionary definition says usually. Is that what you're relying on to say there's conflict or ambiguity? Well, that's what the court zeroed in on. Maybe just even a misinterpretation of the dictionary definition. The dictionary definition, which was even relied on by the district court, says usually an acid, not always an acid. But the court read that to mean it must be an acid, even though the court itself held there are no acid derivatives in this field of cement chemistry. So the definition selected is not even consistent with the dictionary, let alone with the patent specification. Well, to read an acid requirement in there basically renders the claim meaningless, right? Absolutely, Your Honor. And that was a problem. In fact, the court held so. The court said there is no acid in this patent or in this field. And yet the court adopted the definition exclusively in acid. And therein lies a problem. But why couldn't one kind of construe, let's assume we construe this case as being just an error, that you messed up and you switched the letters. That's a different kind of case than the one you're posing for us, is it not? That's correct. But I think that's what caused the confusion, not what what we're arguing here. Let's assume we were to look at this entire record and conclude you all messed up. You're right that this couldn't mean what you said it means in the context of the spec and this invention. But we construe this as having been a mess up. Not that you did it because you were being your own lexicographers, but somebody just messed up. How then would we analyze this case? Do you mean made a mistake in drafting the patent? Yes. By using this term as opposed to anhydrite. Well, there would have to be a fairly large mistake because anhydrite with a T refers to the entire product, calcium sulfate anhydride or anhydrous calcium sulfate. Let's assume it was a typo. Just a series of typos. How do we analyze that if we presume that that's what happened here? Well, one can look at the term in context. If the entire patent had simply used the term anhydride without any other terms, then I think the issue of perhaps typographical error comes up because the word alone, anhydride, is confusing. You're saying it's ambiguous and it's a meaning that doesn't make sense. And therefore, we ought to resolve ambiguity using all the resources we have. Yes, Your Honor. Although I would suggest that given the construction of contemporaneous patents, which we cited, such as a 338 patent from Phillips, of all people, at the same time, this term, calcium sulfate anhydride with a D, was used at the time and was understood to mean what we suggest, which is the anhydrous form of calcium sulfate. Again, we must look at the entire phrase, calcium sulfate anhydride. The word anhydride never appears alone in the patent. If it did, I would agree. There would be an issue we would be talking about. But you told Judge Dyke that since that doesn't exist in the field of cement because it's acid, then I don't understand how you could, I thought you were telling Judge Dyke, that your answer to Judge Dyke implied to me that even if the term appeared on its own, because it has no significance in the field of cement making, we would be asked to construe it as anhydride as well. No? Well, Your Honor, I think if we look at the argument that we made to the district court at Appellant's Appendix 3384, we stated, quote, calcium sulfate, CaSO4, without associated water, anhydrous, is called anhydrite. That's anhydrite referring to the whole thing, calcium sulfate anhydrous or anhydrite. The dictionary defines anhydrite as a chemical compound formed from another, often an acid, by the removal of water. This definition states the compound is often an acid but not always. Thus, in context, soluble CaSO4, calcium sulfate, anhydrite should mean calcium sulfate with some or all water removed, which is the same as anhydrite. This is the argument we gave to the district court, that the entire phrase taken as a whole refers to anhydrous calcium sulfate. Let me let you move on to latches because that's where you want to go, I'm sure. No, it's fine. If Your Honor has any questions. No, go ahead. I wouldn't presume to. Is your main argument on latches that it shouldn't have been resolved on summary judgment, that there was some sort of factual dispute that needs an evidentiary hearing? Exactly, Your Honor. I think the problem here is that the court applied the six-year rule, and then having applied six years, the court essentially shifted the burden of proof to the plaintiff to prove that the delay was not unreasonable and the delay was not prejudicial. Well, isn't that right? I mean, there's a six-year, not a six-year rule, it's a six-year presumption, right? That is correct. So once there's a presumption, shouldn't the burden shift to your side? Well, but there's an issue before that. Under Wanless v. Feathers, before the court can impose that presumption, it must have no disputed facts as to when the plaintiff knew or should have known of the infringement. The court cannot simply say it's been six years, we apply the presumption. The first inquiry before even reaching the presumption under Wanless is, are there disputed facts as to when the plaintiff knew or should have known of the infringement? And here there were disputed facts. In particular, we had reassurances from the defendant, Mr. Rice, that he was not infringing. Yeah, but those don't get you off the hook. People often say, I'm not infringing. It's the obligation of the patentee, if he wants to avoid clashes, to take steps to test or to bring an action, not to just say, well, I accepted your denial. But in this case, the undisputed facts are that it is not possible to test the product post-production for the presence of the key ingredient, which is the soluble calcium sulfate anhydride. And that is undisputed on this record. One must have information about the manufacturing process before one can determine if they're using it. So what is it precisely that you discovered in the context of discovery of the 684 patent that led you to suddenly let the light bulb go on and say, yes, there's cause for infringement? The 684 or the 556? I thought you were saying you ultimately discovered the infringement of the 556 in connection with discovery for the 684. Am I wrong about that? That is correct. Okay. So what happened? Well, the sequence of events was the 684 patent has some unique crystals in the cement, which can be tested for. And through a very complicated series of experiments, actually our expert synthesized the chemical and then made reference samples of the chemical in samples of cement known not to contain that product. And then we compared that to the product and found that the product, this was around 2002. Why couldn't you have done that before? Well, we could not have done that for the 556. Well, the 684 patent was not issued until 2000. Right. As far as the 556, again, undisputed on this record, there's no way to test the final product for the presence of the soluble calcium sulfate anhydride. And again, this is undisputed on this record. The sequence of events was the 684 patent was issued. We tested the cement, found that it contained the crystals, the unique crystals from the 684. Let me touch on one of the other issues. Why wasn't the 534 patent properly held to be invalid as obvious over the 408 patent and 556? Your Honor, I think that with respect to the- Your Honor referring to claims 10 and 11 of the 534, the 534 as a whole. With respect to claims 10 and 11, there's the additional ingredient of the fluoride. But you didn't argue in your opening brief that the district court was wrong in finding claims 10 and 11 of the 534 to be invalid, right? It was mentioned in our opening brief, but I would have to say, Your Honor, that is not the heart of this appeal. So it wasn't preserved. So why do we have to reach the issue of infringement of claims 10 and 11? Well, infringement wasn't raised, but I think Your Honor is correct on that. Our focus on this appeal is the 556 and 684 patents. Our concern on the 534 ruling, frankly, are some of the rulings that we hope will not survive to the next stage, if there is a next stage. Such as the court held that we had to prove that every single bag of cement infringed by testing separately every single bag. And we don't think that's- But that's a moot issue if the claims 10 and 11 are invalid. You're asking us to give an advisory opinion on something that's moot. Well, we hope that, again, if that standard is not applied to the 556 and 684 patents. That was the main reason for raising these arguments as to the 534. That was our main concern on those issues. That some of those, I don't know if you'd call them evidentiary or burden of proof rulings, not survive to the next stage. That was our main concern. I'm not here to fight hard over the validity of claims 10 and 11 of the 534 patent. We raised certain specific evidentiary burdens that the court seemed to have laid on us. And we just hope those will not survive if the rest of the decisions are reversed. We're well into your rebuttal time. Do you wish to save it? If I could just conclude on the last issue, Your Honor. The record shows clearly that after the lawsuit was filed, there was document discovery. And in particular, the defendants produced internal memos in which one of them, the chairman of the company, said soluble anhydride is the trigger to our reaction. Once we had that, we knew they were using the soluble anhydride, and we moved to amend for the 556 patent. And just in closing, I would ask if Your Honors could please look at the issue of amending the complaint. I know it's a purely procedural issue, but it has a real effect. And we would hope that that could be addressed. There's a remaining time for rebuttal. Thank you. Thank you. Mr. Chariot. Thank you, Your Honor. First, something that we missed in our briefing that's important. There is a footnote in the district court's opinion with regard to the Phillips patent, upon which some substantial reliance has been placed. Which opinion? I'm sorry. I'll give you the site. Is this the reconsideration which you discussed? No. Appendix 252. What's the point? The point is that in the district court, the Phillips and other patents relied on by Appellant here to show, as purportedly showing something about anhydride, were not admitted into the record because they were offered too late. Oh, well, they're public documents we can take notice of. Let me ask you a question. Is it not true that there are conflicting dictionary definitions of anhydrides? That some seem to limit it to an acid and some don't? No. They're not inconsistent. I didn't say inconsistent necessarily. Or ambiguous. I'm sorry. I submit they're not ambiguous either for this reason. When they say usually or typically, what they mean is that instead of an acid, another compound like an acid salt can be used to make an anhydride. They're not talking about going beyond the field of... Well, how do we know that from the dictionary definitions? The dictionary definitions, some of them don't say that it has to be an acid. Some say it's often an acid or usually an acid, which suggests that it's not always an acid, right? I submit to you, Your Honor, that the patents are directed to those skilled in the art. And one skilled in the art would know that an anhydride, forget the definition. That is what you say. How do we know that, that one skilled in the art would look at it that way? Because the other patents seem to use it in the other way. Because the neutral expert is a man who is opining on the person skilled in the art, and he's the only one who did so. To me, your argument with respect to the neutral expert is kind of disabused by the... I mean, the neutral expert's opinion says, given the context that anhydride is used in the patent, it is not unreasonable to assume the author meant anhydrite and not anhydrite. Absolutely. So the neutral expert seems to be agreeing with the other side more so than you, right? But remember, the neutral expert had been exposed to all the arguments about what the patentee really meant. And to get back to first principles... Wait, wait, wait. Don't leave the neutral expert. He didn't say that the only definition is the acid definition. He said that it's a common definition, right? What's the exact language that he used? I have it here in front of me. A common definition... Yeah, a common definition. That's not the same thing as saying the only definition, right? That's true. But if we veer off into the realm of who knows what kind of obscure definitions that someone out there might have, the patents lose their meaning. You're trying to read this patent claim in a way that makes it meaningless, right? Yes, absolutely right. So if there's ambiguity here, shouldn't we read the patent in a way that the claim makes sense? There's no ambiguity... Answer my question. Assuming that there is ambiguity, shouldn't we read it in a way that makes sense out of it? No, not in the circumstances of this case. Because the law is that this court takes claims as it finds them. We're not... But it interprets ambiguous claims based on all the relevant information. Indeed. Including principally the specification. And there is nothing in the specification that indicates that calcium sulfate is derived from the elimination of water, which is basically what an anhydride is. All right, let me give the court a few examples. If I intend in a claim to say cat and I say rat, if I intend to say bungle and I say burgle, we have totally different meanings. The word itself... Yes, but the assumption here is that we're dealing with a term that's ambiguous. And you're saying you want us to, even if it's ambiguous, to construe the claim in a way that makes no sense. What kind of a rule of construction is that? The rule of construction would be that the patentee is left in the position in which he puts himself. I repeat, the law in this court is the court takes claims as it finds them. And it's not up to the court... And what you're saying, Your Honor, I respectfully submit, is that this court would become an office that reissues patents to cure errors. And it's not. And I point out that no effort was made by the patentee over a 20-year period to either retain a certificate of correction or submit the patent for reissue, which would have been the proper procedures... There has to be a certificate of correction? No. But what I'm saying is the ambiguity here is not an ambiguity of the sort that typically arises. What's the difference between the ambiguity here and the usual ambiguity? Here, there's no doubt that anhydride has a meaning, and that that meaning is it's a substance derived from an organic acid. Your Honor... There are different dictionary definitions, so it's not clear. No one has... I'm sorry. Go ahead. Nothing has been proffered to say that an anhydride is anything other than an organic compound, which has a definite meaning and is always associated with some organic acid. So it would be acetic acid anhydride, succinic acid anhydride, whatever. But anhydrides are a known class of compositions. Whether or not they're made from acids is not the point here. The point is, are they known compositions? Do they have a structure which is known unambiguously in the art? The answer to that is, yes, they do. Mr. Garriack, I want to ask you about the holding of indefiniteness of the 684 patent. Yes, sir. These are complicated claims, claims involving clinker having nothing to do with the clunker. Yes, that's right. Although you would say that the case is a clunker. Wouldn't you agree that the claims, while broad, are not indefinite? One can figure out what they are. I would agree with that as a general proposition. But look at what's going on here. The interpretation proffered by the neutral expert and by simple arithmetic demonstrates that the Crystal X composition covers on the order of 5,500 different compositions. So it's a broad claim. It's a broad claim. In this case, though, the patentee is attempting to persuade the court that it's limited to a single substance. And when you have two people who disagree, so what? Is that because it's inoperable if it's not limited to that single substance? Either inoperable or unknown. I mean, when you have 5,500 compositions that haven't been tested, who knows what works and what doesn't work. But that's not the challenge here. Well, it was for the district. The challenge was indefiniteness. Yes. The whole thing was indefinite. Right. And what the district court said was, after hearing that the appellant wants Crystal X interpreted to mean simply calcium aluminosulfate, that he should have said so in the first place. And that to present a claim which was so all-encompassing of so many other compounds when only a single compound was intended made the claim indefinite. And with regard to Crystal Y, the situation is even worse. And if Crystal Y is indefinite, then the claims are indefinite, regardless of whether Crystal X is indefinite. Let me ask you about latches. Yes. How should Ultimax have known for the 13 years preceding the suit? How should they have known or discovered that you were allegedly infringing? For several reasons. And as we point out in the brief, the most important one is, regardless of the ability to test for a calcium sulfate product, I'll leave out the anhydride, the anhydride part, which they say was impossible, it was plain that it was calcium aluminosulfonate cement. It was plain that it had a compression of more than 3,000 psi in an hour. Well, that's just suggesting they could have tested for other claim limitations. Is it not true that there was one claim limitation they couldn't test for? Well, it is true. But when you have multiple claim limitations and all the others are easily tested for or observed, you get pretty close to the if it walks like a duck and quacks like a duck, it's probably a duck. And that's the situation here. I mean, if this court permits, and there was no follow through with CTS. You probably would have accused them of impropriety if they'd sued without testing for every claim limitation. We would. Yeah, you would have. And now you're saying that they should have sued when they couldn't test for the one claim limitation. No, what we're saying is that if you sit on a right for 13 years, when there were multiple indications that infringement might be occurring, you are putting yourself in a position where you're going to be disadvantaged by all that delay. If you have sufficient information, you have several recourses. One is to go to the perceived infringer and demand an answer. If you can't get it, courts have repeatedly held you have grounds for suit. But nothing was done here to follow up. They got an answer apparently, right? They said we're not infringing. Well, I mean an answer that tells you why you're not infringing. Everybody... He did say we're not infringing, right? Yes, he did. So you're basically saying that somebody, it's irrelevant that somebody might have misrepresented the situation. There's no misrepresentation. Well, suppose there was. Well, if there was, that would create a different case. That's not the case we have here. Well, are you saying that where they missed the boat was that they should have said, when you said you're not infringing, they should have demanded to know why? Yes. And that if they had asked that question and if your response had been, well, we're just not, the burden of proof is on you, that they could have gone in and there would be no problem? Yes, I am. That's in district court practice. That happens all the time. Now, if someone makes a legitimate effort to determine whether there's an infringement and can't, you can bring a lawsuit on that basis. In other words, the infringer's hiding the ball. But here, Your Honor, the important thing is, there was ample reason for Mr. Rice to deny infringement beyond the issues we've talked about here. I mean, one, his composition didn't contain an anhydride. Another, it's an undisputed fact that the clinker made by CTS is cementitious, whereas the clinker made by the patent, 556 patent, must be mixed with hydraulic cement in order for the cement to be a cementitious product. That's a profound difference, which was a separate and entirely legitimate. What were they supposed to do here when Rice told them that he wasn't infringing? What is it exactly that the patentee was supposed to do here? What were they supposed to do? How were they supposed to find out whether he was infringing? To ask him why he didn't infringe, and if he refused to tell him, sue him. You could sue just because somebody refuses to tell you? Yes. Really? That's a sufficient pre-suit investigation? Under those circumstances. I mean, it requires diligence and following up. Yes, but otherwise... If you're upheld a patent, and you ask somebody if you're infringing, and the person says, I'm not, but I won't tell you, that's a sufficient pre-suit investigation so you can sue? No, I didn't say that. No, it's not, right? It's not. But there's a difference between being diligent in pursuing your rights and not being diligent in pursuing your rights, and that's what we have here, an utter lack of diligence in pursuit of rights. Was there the possibility of taking samples and determining themselves? I'm not sufficiently well-informed to know, but... So I'll say I'm sorry I don't know on that issue. Could I spend two minutes on the exceptional case? I will give you two minutes on the exceptional case. Thank you, Your Honor. And we'll provide two extra minutes for appellant. All right. With regard to this being an exceptional case, call the court's attention to a letter from Mr. Solem, counsel for CTS in 2002. He was conflicted out because he changed law firms and his new firm, Fulbart & Jaworski, had a conflict that his prior firm, Lyon & Lyon, did not have. So he was counsel for CTS in the early stages of the litigation. And he says in a letter dated November 27, 2002, to counsel for Ultimax, that there is ample proof of CTS manufacture and sale of cement in the United States prior to the April 16, 1998 priority date, which invalidates the relevant claims in that instance of the 534 and the 684 patents. It was after that letter that the 556 patent was added. In other words, there were statutory bars with regard to the 534 and the 684 patents. And the district court so found in the proceedings on the 534 patent that exactly what Mr. Solem said was true. So what's the point? The point is that by pursuing those patents in the face of the evidence that was provided to them in 2002. You're suggesting the claims were frivolous? Yes. I'm suggesting that this whole appeal is frivolous. I see. Because if we look at everything that's been appealed, anhydride, anhydride, attempt to reissue in my, I submit, reissue the patent, the 556 patent. With regard to Crystal X and Crystal Y, the same thing. We never really got to Crystal Y, and I won't try to get into that. Gary, we've exceeded the two minutes, and I think we understand your point. All right. So let's give Mr. Pashani his remaining time plus two minutes. Thank you, Your Honor. Just a couple of points raised. Again, what we keep hearing here is the word anhydride, and we hear an anhydride is this, an anhydride is that. The word anhydride never appears standalone in the patent. It's always soluble calcium sulfate anhydride, and in that context it can be discerned as to the meeting and the construction that we submit as we offered to the district court and to this court. And you're saying probably the dictionaries that refer to calcium sulfate and anhydride don't refer to its origin being from acids. Well, necessarily not because the concept of acid does not occur with this chemical. I think that anhydride is a modifier, and in this case it is modifying calcium sulfate. Given the suspicions here, I mean you hired a private investigator, given that you thought enough to go and ask them are you infringing, why didn't you ask them for some proof or some more information or ask them to explain it? I mean they might have said no, but you asked them if they were infringing. Why didn't you go the extra step? And if you didn't, why don't you think that's enough for us here? I wanted to address that, Your Honor. Your Honor asked why, was an explanation given as to why they were not infringing, and the record shows that Mr. Rice stated that he believed that the use of the soluble anhydride I believe Mr. Rice uses the term anhydride with a D, actually, in their own memos. He said it was not economical. It was uneconomical, and this is undisputed in the record. So the alleged infringer not only gave a flat-out denial, but also gave an explanation as to why, which seemed plausible. Did you hire the private investigator before or after that explanation from Mr. Rice? Well, after that explanation, some information was received that suggested a possibility of infringement. Was that within six years of the filing? Yes, yes, I believe so. That was not more than six years. No, I don't remember. The exact date I believe was 1998, thereabouts, something of that, or 99. I'd have to check the record for the timing. But the point is we did act. We sent the investigator out, and he was unable to discover this. And if we look at sort of deeper into this area, into Mr. Rice's own memos, what they were doing was heating the calcium sulfate in the gypsum form to form the soluble anhydride. And, in fact, he mentions that in one of his memos, and this is what led us to add the 556 patent. Mr. Rice said perhaps the mill temperature is wrong to form the soluble anhydride. So this is not an ingredient that you could stand outside their plant and see if it's going into the plant. The soluble form of the calcium sulfate was created through a manufacturing process, which would be very difficult to discern without their manufacturing memos, which we only obtained after suit. Thank you, Mr. Khashoggi. Thank you, Mr. Khashoggi.